# 23-6099

*To Be Argued By*:
DANA REHNQUIST

# United States Court of Appeals

## For the Second Circuit

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LAFI KHALIL,

*Defendant,*

GAZI IBRAHIM ABU MEZER, AKA AMIR,

*Defendant-Appellant.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

**BRIEF AND APPENDIX FOR THE UNITED STATES**

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

JO ANN M. NAVICKAS,
DANA REHNQUIST,
*Assistant United States Attorneys,*
*Of Counsel.*

i

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................ii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS .................................................................. 3

    I.    Offense Conduct, Indictment, and
           Trial Conviction.................................................................. 3

    II.   Sentence ............................................................................. 7

    III.  Direct Appeal and Various Post-
           Conviction Challenges...................................................... 11

SUMMARY OF ARGUMENT .......................................................... 17

ARGUMENT – THE DISTRICT COURT'S ORDER
              SHOULD BE AFFIRMED ........................................... 19

    I.    Standard of Review ......................................................... 19

    II.   Applicable Law................................................................ 20

    III.  Discussion....................................................................... 21

        A.   Abu Mezer Is Not Entitled to
               De Novo Resentencing and the
               District Court Did Not Abuse
               Its Discretion............................................................ 21

        B.   Abu Mezer's Arguments to the
               Contrary Are Mistaken............................................27

CONCLUSION ................................................................................. 32

TABLE OF AUTHORITIES

Page(s)

CASES

Anderson v. City of Bessemer City, N.C.,
   470 U.S. 564 (1985)...................................................................19

Ayyad v. United States,
   No. 16-cv-4346 (LAK), 2020 WL 5018163
   (S.D.N.Y. Aug. 24, 2020)..........................................................29

Gonzalez v. United States,
   792 F.3d 232 (2d Cir. 2015) .....................................................19

In re Arab Bank, PLC Alien Tort Statute Litigation,
   808 F.3d 144 (2d Cir. 2015) .....................................................22

In re Zarnel,
   619 F.3d 156 (2d Cir. 2010) .....................................................21

Troiano v. United States,
   918 F.3d 1082 (9th Cir. 2019)...................................................27

United States v. Augustin,
   16 F.4th 227 (6th Cir. 2021),
   cert. denied, 142 S. Ct. 1458 (2022)...........................22, 23, 27

United States v. Ayyad,
   No. 20-3832, 2023 WL 1975682
   (2d Cir. Feb. 14, 2023) ......................................................23, 24

United States v. Booker,
   543 U.S. 220 (2005)..................................................................25

United States v. Carter,
   696 F.3d 229 (2d Cir. 2012) .....................................................19

United States v. Cavera,
  550 F.3d 180 (2d Cir. 2008) ................................................. 19

United States v. Davis,
  139 S. Ct. 2319 (2019).................................................... 23, 24

United States v. Fertides,
  No. 20-3809-cr, 2021 WL 5918301
  (2d Cir. Dec. 15, 2021) ....................................................... 26

United States v. Gordils,
  117 F.3d 99 (2d Cir. 1997) ...................................... 20, 30, 31

United States v. Hertular,
  562 F.3d 433 (2d Cir. 2009) ................................................. 30

United States v. Jass,
  569 F.3d 47 (2d Cir. 2009) ................................................... 22

United States v. Jones,
  114 F.3d 896 (9th Cir. 1997)................................................. 20

United States v. Medunjanin,
  No. 10-cr-0019 (BMC),
  2020 WL 5912323 (E.D.N.Y. Oct. 6, 2020) .......................... 29

United States v. Moore,
  83 F.3d 1231 (10th Cir. 1996)............................................... 20

United States v. Palmer,
  854 F.3d 39 (D.C. Cir. 2017) ...........................................27-28

United States v. Peña,
  58 F.4th 613 (2d Cir. 2023)......................................... passim

United States v. Quintieri,
  306 F.3d 1217 (2d Cir. 2002) .............................................. 29

United States v. Rigas,
  583 F.3d 108 (2d Cir. 2009) .................................... 21, 29, 30

iv

United States v. Wilkerson,
  361 F.3d 717 (2d Cir. 2004) ................................................................22

Yick Man Mui v. United States,
  614 F.3d 50 (2d Cir. 2010) ................................................................19

## STATUTES

18 U.S.C. § 924(c) .................................................................... passim

18 U.S.C. § 2332(a) ....................................................................25

18 U.S.C. § 3553(a) ..............................................................25, 26

18 U.S.C. § 3582(c) ....................................................................20

28 U.S.C. § 2255 ........................................................................ passim

28 U.S.C. § 2255(b) ..............................................................20, 28

28 U.S.C. § 2255(c) ....................................................................28

## RULES

U.S.S.G. § 2A1.5(c)(2) ................................................................26

U.S.S.G. § 2A2.1(a)(1)................................................................26

U.S.S.G. § 3A1.1(a) ....................................................................26

U.S.S.G. § 3A1.4(a) ....................................................................26

U.S.S.G. § 3A1.4(b) ....................................................................26

U.S.S.G. § 3C1.1 ........................................................................26

U.S.S.G. § 3C1.2 ........................................................................26

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-6099

UNITED STATES OF AMERICA,

Appellee,

-against-

LAFI KHALIL,

Defendant,

GAZI IBRAHIM ABU MEZER, AKA AMIR,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendant-appellant Gazi Ibrahim Abu Mezer (hereinafter "Abu Mezer" or "Mezer") appeals from an order, entered January 9, 2023, in the United States District Court for the Eastern District of New York (Block, J.), granting in part and denying in part his 28 U.S.C. § 2255

2

motion for relief. The motion challenged Mezer's conviction under 18 U.S.C. § 924(c) in light of the United States Supreme Court's decisions in <u>Johnson v. United States</u>, 576 U.S. 591 (2015), and <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019). While granting Mezer's request to vacate that conviction, the district court declined to grant Mezer a de novo resentencing. Instead, the district court determined to adhere to the original sentence: a concurrent life term on each of two counts charging Mezer with weapons of mass destruction crimes in violation of 18 U.S.C. § 2332a.

On appeal, Abu Mezer contends that the district court erred in failing to conduct a de novo resentencing, arguing that this Court wrongly decided <u>United States v. Peña</u>, 58 F.4th 613 (2d Cir. 2023), <u>pet. for cert. filed</u> (June 5, 2023) (holding that 28 U.S.C. § 2255 petitioners are not necessarily entitled to de novo resentencing even when one or more convictions are overturned). Alternatively, Abu Mezer argues that even if <u>Peña</u> were correctly decided, the district court nonetheless abused its discretion in denying him a de novo resentencing.

For the reasons stated below, Abu Mezer's arguments are without merit, and the district court's order should be affirmed.

STATEMENT OF FACTS

I.   Offense Conduct, Indictment, and Trial Conviction

On June 16, 1998, a grand jury returned a superseding indictment charging Abu Mezer with conspiring to use a weapon of mass destruction, a pipe bomb, in violation of 18 U.S.C. § 2332a (Count One); threatening to use a weapon of mass destruction, a pipe bomb, in violation of 18 U.S.C. § 2332a (Count Two); and using and carrying a firearm, a pipe bomb, during and in relation to said weapon-of-mass-destruction crimes, in violation of 18 U.S.C. § 924(c) (Count Three). (A 35-39).[1]

The crimes described in the superseding indictment arose out of Abu Mezer's participation in a conspiracy to detonate pipe bombs in New York City, as described by this Court in its opinion affirming Abu Mezer's trial convictions:

> In late July 1997, Abdelrahman Mossabah, who was then living with Abu Mezer and [Lafi] Khalil in an apartment in Brooklyn, New York, informed officers of the New York City Police

_____

[1]   Parenthetical references to "Br." and "A" are to Abu Mezer's brief and appendix, respectively; "GA" refers to the government's appendix on appeal, and "DE," unless otherwise noted, refers to entries on the district court's docket in United States v. Mezer, 97-CR-804 (RR).

4

Department that Abu Mezer and Khalil had bombs in the apartment and planned to detonate them soon. According to Mossabah, Abu Mezer had said he was "very angry because of what happened between Jerusalem and Palestine." Abu Mezer had shown Mossabah pipe bombs in a black bag in the apartment and told Mossabah that he planned to take the bombs to a crowded subway or bus terminal and detonate them. Mossabah gave the police a key to the apartment, diagrammed its layout, indicating where the bombs were kept, and led a team of officers to the building before dawn on July 31, 1997.

In the raid on the apartment, two police officers approached the bedroom where the bombs had been shown to Mossabah and heard "ruffling" noises. They opened the door and entered the bedroom, yelling "police, don't move, get down," and saw two men lying on the floor or on a mattress. One of those men lunged, grabbed the gun of one of the officers, and grappled with him; the other man crawled toward a black bag that the officers believed might contain a bomb. The officers shot and wounded both men, disabling them. The wounded men, later identified as Khalil and Abu Mezer, were handcuffed and taken to the hospital.

The officers peeked into the black bag and saw wiring. Technicians thereafter examined the bag's contents; they found pipe bombs, observed that a switch on one of the bombs had been flipped, and were concerned that the bomb would explode before they could disarm it. Other officers went to the hospital and questioned Abu Mezer that morning as to how many bombs there were, how

many switches were on each bomb, which wires should be cut to disarm the bombs, and whether there were any timers. Abu Mezer answered all of these questions, stating that he had made five bombs, that they contained gunpowder, and that each would explode when its four switches were flipped. Abu Mezer was also asked whether he had planned to kill himself in the explosion, to which he responded simply, " 'Poof.' "

Abu Mezer was questioned again that afternoon after being given <u>Miranda</u> warnings. He said, <u>inter alia</u>, that he had made the bombs, "want[ing] to blow up a train and kill as many Jews as possible" because he opposed United States support for Israel. Abu Mezer also stated that he was "with Hamas," a terrorist organization, and had planned to bomb the "B" subway train at 8 a.m. on July 31 because there were "a lot of Jews who ride that train." Questioned as to where he had bought the bomb components, Abu Mezer said he had purchased gunpowder at a gun shop in North Carolina. He had used it to make the bombs found in the raid and had been planning to make one additional bomb in the future. Abu Mezer said that when he realized the police were in his apartment that morning, he had wanted to blow himself up.

\*  \*  \*

[T]he government . . . also presented testimony from an expert witness describing the witness's creation and experimental detonation of a mock-up bomb simulating those found in Abu Mezer's apartment; and it introduced a letter that Abu Mezer had sent to the United States Department

of State two days before the raid, enclosing a matchstick, and stating, inter alia, "we are warning all U.S. citizen embassy building and everything belong [sic] to the Jewish and Americans in or out said united [sic] stat [sic] or anywhere around the world we are ready by our soul blood boombes [sic ]...." In addition, in light of Abu Mezer's argument in his opening statement that he had never intended to detonate the bombs but had merely hoped to obtain money from a United States government program offering rewards for information on terrorism, the government introduced into evidence three photographs that Khalil had taken of Abu Mezer in North Carolina a few weeks prior to the arrests. One photograph showed Abu Mezer holding a shotgun horizontally above his head; the second showed him wearing a scarf that belonged to Khalil and was of a type typically worn by young Palestinian males to signify their roles as extreme warriors; in the third, Abu Mezer was kneeling on the floor in the posture of a martyr in prayer.

Abu Mezer testified at trial in his own defense. He stated that he had come to the United States because he wanted to punish the United States for supporting Israel. He said he had written a letter to the FBI threatening multiple bombings because he wanted to "send them a message" about United States support of Israel. In July 1997, he and Khalil had gone to North Carolina looking for work. While there, Abu Mezer bought materials with which to make bombs, including gunpowder, pipes, caps, wires, switches, and batteries, and brought them back to New York with him. Abu Mezer said that he had made five bombs. In constructing the bombs, he added

7

dozens of nails so that the explosion would inflict as much damage as possible. He planned to use the bombs "against the Jewish [people] of the United States"; with one of his bombs, he planned to "[b]low[ ][him]self up" and take "as many Jews as possible" with him. Abu Mezer denied, however, any plan to bomb the subway.

Abu Mezer testified that he was alone when he purchased the bomb-making materials in North Carolina. He said he had never told Khalil of his purchases or of their intended use; and he had never shown Khalil any parts of the bombs or discussed with him using a bomb in any way.

United States v. Khalil, 214 F.3d 111, 115-17 (2d Cir. 2000) (internal citations omitted).

II.     Sentence

Abu Mezer was convicted on all counts after a jury trial in 1998. (DE 116). Prior to Mezer's sentencing, the United States Probation Department prepared a presentence investigation report ("PSR")[2] that, after taking into account all objections by the parties, calculated Mezer's total offense level under the United States Sentencing Guidelines ("U.S.S.G.") to be 49: (1) a base offense level of 28 (U.S.S.G. § 2A1.5(c)(2))

---

[2]     Copies of the PSR and its addenda are being sent to the Court under seal.

for conspiracy to use a weapon of mass destruction/threatening to use a weapon of mass destruction, which included a cross-reference to U.S.S.G. § 2A2.1(a)(1); (2) enhanced by two levels for role in the offense pursuant to U.S.S.G. § 3B1.1(c) (organizer); (3) enhanced by three levels pursuant to U.S.S.G. § 3A1.1(a) (victim-related adjustment: targeting specific group); enhanced by twelve levels pursuant to U.S.S.G. § 3A1.4(a) (victim-related enhancement: terrorism); (4) enhanced by two levels pursuant to U.S.S.G. § 3C1.1 (obstruction of justice); and (5) enhanced by two levels pursuant to U.S.S.G. § 3C1.2 (reckless endangerment during flight). (PSR Addendum One ¶¶ 27-33; PSR Addenda Two and Three).[3] With a criminal history calculated at VI, pursuant to U.S.S.G. § 3A1.1(b), Abu Mezer faced a life sentence on Counts One and Two. (PSR Addendum One ¶¶ 46, 82). Mezer also faced a thirty-year consecutive sentence on Count Three, the 18 U.S.C. § 924(c) charge. (PSR Addendum One ¶¶ 81, 82).

---

[3] The Guidelines were further influenced by a multi-count analysis necessitated by Abu Mezer's firearm conviction, but the analysis did not have any effect on the ultimate Guidelines sentence. (PSR ¶¶ 35-41).

9

The district court conducted a sentencing hearing on March 1, 1999. (GA 1-32). At that time, the court carefully addressed all of Abu Mezer's objections to the PSR and determined that all enhancements – except for the enhancement for role in the offense – were appropriate. (GA 5-14, 24).

Abu Mezer also addressed the district court at sentencing. (GA 14-22). He showed no remorse. Instead, he attacked the State of Israel, the United Nations, the United States, and his trial counsel, blaming them all for his predicament. (Id.).

At the conclusion of the hearing, then-United States District Court Judge Reena Raggi sentenced Abu Mezer to concurrent life terms on Counts One and Two to be followed by a consecutive term of 30 years' imprisonment on Count Three. (GA 30). In imposing sentence, Judge Raggi stated:

> The crimes of conviction are extraordinarily serious. They involve a plan to use a weapon of mass destruction, which went so far as to result in the actual construction of a number of bombs designed and executed so as to wreak maximum human damage. That was apparent from the nails that were affixed to many of the bombs.

Moreover, from all of the evidence that was adduced at trial, it appears that the police intervened literally hours before these bombs were to be placed on a New York City subway.

I recognize that Mr. Abu Mezer takes the position that he did not intend to place them on a subway train, but he did testify that he intended to place them somewhere where he could kill as many Jews as possible. So wherever he intended to place them, the people of this city were literally hours away from having a terrorist attack carried out.

It was only through the efforts of the New York City Police Department that that was prevented and that the only two people injured in this entire scheme were the defendant and his friend, Mr. Khalil.

Such conduct is so violative of the public peace and safety as to warrant significant punishment in its own right and serious deterrence for anyone else who might be inclined to engage in that. A life sentence seems to be appropriate.

\*    \*    \*

The crimes of conviction would have presented terrible consequences for average citizens in this district far removed from these international questions. These people, too, would have been the victims of Mr. Abu Mezer's terrorism, had families, children, jobs, homes.

> Whatever has occurred in Mr. Abu Mezer's life, there is no excuse for the decision he made to have these sorts of people bear the consequences of his hatred and frustration.
>
>           \*     \*     \*
>
> [B]ut you, by your own words, make plain to the court what the truth is, and that is whatever has caused it, you are consumed by hate, you have your own narrow view of your situation, the world's policy decisions, and history, and apparently no one is going to dissuade you from it. I think you present as much of a risk now as you did on the night you were arrested.

(GA 25-30).

## III.   Direct Appeal and Various Post-Conviction Challenges

As noted above, Abu Mezer unsuccessfully challenged his conviction on direct appeal. See Khalil, 214 F.3d 111.

Subsequently, on April 23, 2001, Abu Mezer filed a motion pursuant to 28 U.S.C. § 2255 to vacate his conviction. (See Mezer v. United States, 01-CV-2525 (RR), DE 1, 2). The district court denied that motion in August of 2001. (Id., DE 16).

Since 2002, Abu Mezer has filed numerous additional motions challenging his conviction and sentence, each of which the district court has denied. (See, e.g., id., DE 56 (order denying Fed. R. Civ. P. 60(b)

motion); <u>id.</u>, DE 79 (order denying petition for writ of error coram nobis); <u>id.</u>, DE 87 (order denying second Fed. R. Civ. P. 60(b) motion)).

Abu Mezer also has moved unsuccessfully for leave to file successive habeas petitions, <u>see</u> <u>Mezer v. United States</u>, Docket No. 06-1498 (2d Cir.) (May 1, 2006 order denying successive 28 U.S.C. § 2255 petition); <u>Mezer v. United States</u>, Docket No. 14-2607 (2d Cir.), DE 8 (October 8, 2014 order dismissing action for failure to file second successive § 2255 petition), as well as has sought certificates of appealability as to the district court's orders denying his two prior Fed. R. Civ. P. 60(b) motions and his petition for a writ of error coram nobis (<u>Mezer</u>, 01-CV-2525 (ERK), DE 81, 88). In January 2008, this Court issued a mandate denying each such request. (<u>Id.</u>, DE 90).

On August 17, 2016, Abu Mezer filed his third Fed. R. Civ. P. 60(b) motion (DE 205) and a supplemental letter (DE 207), claiming that the district court lacked jurisdiction over his case and alleging various forms of procedural error including defects in the indictment, trial, presentence investigation report, and sentencing process. (<u>See, e.g.</u>, <u>id.</u>, DE 207 at 2 ("[T]he district court lacked subject matter to enter judgment against me because [the] essential elements of crimes that I been [sic]

13

indicted for never [sic] proven beyond [sic] reasonable doubt by the government."); id., DE 205 at 3-4 ("[T]he U.S. District Court lacked jurisdiction to impose a sentence under the constitutionally flawed U.S. Sentencing Guidelines that have now been 'voided'"). On February 12, 2020, the district court issued a stay of Abu Mezer's third Fed. R. Civ. P. 60(b) motion pending this Court's decision on the permissibility of Mezer's latest successive § 2255 petition. (DE (Order dated 02/12/2020)).

On April 28, 2020, this Court granted Abu Mezer's motion for leave to file a successive 28 U.S.C. § 2255 motion, in order to challenge his conviction under 18 U.S.C. § 924(c) in light of the Supreme Court's decisions in Johnson v. United States, 576 U.S. 591 (2015), and United States v. Davis, 139 S. Ct. 2319 (2019). (DE 243). In its mandate, this Court "acknowledge[d] that Petitioner's § 924(c) conviction might still be supported by a valid predicate, even if the other predicate is no longer valid after Johnson and Davis." (Id. at 2). Counsel was appointed on April 30, 2020, and Abu Mezer, through counsel, filed his successive 28 U.S.C. § 2255 motion on June 25, 2021, and a pro se supplement on August 19, 2021, alleging that 18 U.S.C. § 2332a (threatening to use a weapon of mass destruction) is not a crime of violence after Johnson and

14

<u>Davis</u>.  (DE 245, 260, 262).  The government argued that threatening to use a weapon of mass destruction constituted a crime of violence and as such supported his § 924(c) conviction on Count Three.  (DE 265).

On January 9, 2023, Judge Frederic Block[4] issued a memorandum and decision that vacated Mezer's conviction under 18 U.S.C. § 924(c) on the basis that threatening to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, is not a crime of violence. (A 46-54).  Accordingly, the district court vacated Abu Mezer's § 924(c) conviction.  (A 54).  In doing so, the court denied Mezer's request for de novo resentencing on the remaining counts of conviction, leaving the concurrent life sentences previously imposed on Counts One and Two undisturbed.  (A 53-54).

In reaching its decision to deny Abu Mezer a de novo resentencing, the district court relied on this Court's decision in <u>United States v. Peña</u>, 58 F.4th 613 (2d Cir. 2023) (holding that 28 U.S.C. § 2255 petitioners are not necessarily entitled to de novo resentencing even

---

[4]    The matter had been re-assigned to United States District Judge Frederic Block in September 2006.  (DE (entry dated 09/01/2006)).

when one or more convictions are overturned), and also found that, given

the nature of Mezer's crimes, a life sentence was appropriate in this case:

> The Court must now decide whether to resentence Abu Mezer. When a conviction is vacated on direct appeal, the "default rule" is that the district court must resentence the defendant de novo on the remaining counts. See United States v. Rigas, 583 F.3d 108, 115 (2d Cir. 2009) (citing United States v. Quintieri, 306 F.3d 1217, 1227-28 (2d Cir. 2002)). However, the Second Circuit recently held that the same rule does not apply to a vacatur resulting from a successful § 2255 motion. See United States v. Peña, 55 F.4th 367 (2d Cir. 2022).[5] Rather, the statute's plain text "vests district courts with discretion to select the appropriate relief from a menu of options." Id. at 372. Having vacated a conviction, the district court may "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).
>
> Here, the Court exercises its discretion to "correct" Abu Mezer's sentence rather than resentencing him. As noted, a successive 2255 motion is authorized only in exceptional circumstances. The only circumstance justifying Abu Mezer's successive motion is the Supreme Court's decision to apply Johnson and Davis retroactively to cases on collateral review. The remedy should, in the Court's view, be similarly limited. Resentencing Abu Mezer on his § 2332a

---

[5] Peña was subsequently amended and superseded, but its general holding concerning de novo sentencing remained unchanged.

> convictions – the validity of which is beyond dispute – would raise all sorts of sentencing issues going far beyond the implications of <u>Johnson</u> and <u>Davis</u> and, therefore, beyond the proper scope of a successive § 2255 motion. In any event, the seriousness of the offense leads the Court to conclude that it would adhere to the original sentence.

(A 53-54).

This appeal followed.

## SUMMARY OF ARGUMENT

Abu Mezer is not entitled to de novo resentencing, and the district court did not abuse its discretion in denying his request for such relief.

Unlike the vacatur of a conviction on direct appeal, the vacatur of a conviction pursuant to 28 U.S.C. § 2255 does not necessitate de novo resentencing on the remaining counts of conviction. See United States v. Peña, 58 F.4th 613 (2d Cir. 2023). Instead, discretion to select the appropriate relief is vested in the district court. Peña, 58 F.4th at 615.

Furthermore, the district court did not abuse its discretion in declining to resentence Abu Mezer, who, even with the vacatur of Count Three, was still subject to concurrent life sentences on the two remaining counts of conviction (Counts One and Two), which involved Mezer's construction of and intent to deploy several pipe bombs. As such, any resentencing on those counts resembles the type of "empty formality" that Peña, 58 F.4th at 623, suggests does not warrant resentencing. In any event, the district court also made clear that "the seriousness of the [terrorism crimes in question] . . . [led] the Court to conclude that it would

18

adhere to the original sentence." (A 54). That decision, which was premised on Abu Mezer's "plan to use a weapon of mass destruction, . . . designed and executed so as to wreak maximum human damage" (GA 25), was not an abuse of discretion.

ARGUMENT

THE DISTRICT COURT'S
ORDER SHOULD BE AFFIRMED

I.      Standard of Review

This Court reviews questions of law arising from 28 U.S.C.
§ 2255 motions de novo and subsidiary factual findings for clear error.
Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010); see also
Gonzalez v. United States, 792 F.3d 232, 234 (2d Cir. 2015). "[A] finding
is clearly erroneous when although there is evidence to support it, the
reviewing court on the entire evidence is left with the definite and firm
conviction that a mistake has been committed." Anderson v. City of
Bessemer City, N.C., 470 U.S. 564, 573 (1985) (internal quotation marks
omitted).

The reasonableness of a sentence is reviewed for abuse of
discretion. United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) (en
banc). "[A] district court has abused its discretion if it based its ruling on
an erroneous view of the law or on a clearly erroneous assessment of the
evidence, or rendered a decision that cannot be located within the range
of permissible decisions." United States v. Carter, 696 F.3d 229, 232 (2d
Cir. 2012) (internal quotation marks omitted).

20

II.   <u>Applicable Law</u>

Congress has broadly and generally prohibited courts from "modify[ing] a term of imprisonment once it has been imposed" except "to the extent otherwise expressly permitted by statute." 18 U.S.C. § 3582(c). One such statute is 28 U.S.C. § 2255, which confers upon district courts the discretion to "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). This Court has observed that this provision of the statute gives the district court "broad and flexible remedial authority, having 'vacate[d] and set the judgment aside,' to resentence a defendant and correct the sentence as appropriate." <u>United States v. Gordils</u>, 117 F.3d 99, 103 (2d Cir. 1997) (quoting § 2255(b)); <u>see also, e.g.</u>, <u>United States v. Jones</u>, 114 F.3d 896, 897 (9th Cir. 1997) ("[T]he statute gives district judges wide berth in choosing the proper scope of post-2255 proceedings."); <u>United States v. Moore</u>, 83 F.3d 1231, 1234-35 (10th Cir. 1996) (same).

Among the matters left to the court's discretion is whether or not to conduct a de novo resentencing. <u>Peña</u>, 58 F.4th at 615. Specifically, the <u>Peña</u> Court held that although the de novo resentencing

default rule in <u>United States v. Rigas</u>, 583 F.3d 108 (2d Cir. 2009), may apply "whenever a conviction is reversed on direct appeal, § 2255's plain text, which vests district courts with discretion to select the appropriate relief from a menu of options, precludes us from applying the <u>Rigas</u> default rule to all cases that arise in the § 2255 context." <u>Peña</u>, 58 F.4th at 619. Thus, vacatur of one count on a multi-count conviction, as is the case here, is not an automatic guarantee of de novo resentencing on the remaining counts.

III.   <u>Discussion</u>

A.   <u>Abu Mezer Is Not Entitled to De Novo Resentencing<br>and the District Court Did Not Abuse Its Discretion</u>

Despite Abu Mezer's protestations to the contrary (Br. 20-30), he is not entitled to de novo resentencing simply because one count of his multi-conviction sentence has been vacated on a § 2255 motion. Indeed, as noted above, <u>Peña</u>, 58 F.4th 613, 615, 619, states to the contrary that de novo sentencing is discretionary in the § 2255 context. In the absence of a decision by the United States Supreme Court that abrogates Circuit precedent, this panel of the Court does not have the authority to overturn prior precedent without en banc review. <u>See, e.g.</u>, <u>In re Zarnel</u>, 619 F.3d 156, 168 (2d Cir. 2010) ("This panel 'is bound by the decisions of prior

panels until such time as they are overruled either by an <u>en banc</u> panel of our Court or by the Supreme Court.'" (quoting <u>United States v. Wilkerson</u>, 361 F.3d 717, 732 (2d Cir. 2004)); <u>see also</u> <u>In re Arab Bank, PLC Alien Tort Statute Litigation</u>, 808 F.3d 144, 154-55 (2d Cir. 2015) ("Generally speaking, 'this panel is bound by prior decisions of this court unless and until the precedents established therein are reversed <u>en banc</u> or by the Supreme Court.'" (quoting <u>United States v. Jass</u>, 569 F.3d 47, 58 (2d Cir. 2009)).

Furthermore, here, the district court did not abuse its discretion in denying Abu Mezer de novo resentencing on the remaining counts. While the <u>Peña</u> Court did not attempt "to define the circumstances under which a district court abuses its discretion in denying <u>de novo</u> resentencing," it did at least expressly except one set of circumstances from any such suspicion by concluding "that a district court may properly deny <u>de novo</u> resentencing when the exercise would be an empty formality." 58 F.4th at 623. In discussing that exception, the Court relied favorably on the Sixth Circuit's decision in <u>United States v. Augustin</u>, 16 F.4th 227 (6th Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 1458 (2022), in which, as here, the district court had vacated an 18 U.S.C.

§ 924(c) conviction and related sentence that was no longer valid under United States v. Davis, 139 S. Ct. 2319 (2019), but did not engage in de novo resentencing. While Augustin argued on appeal that the district court should have resentenced him, the Sixth Circuit found a simple "'sentence correction" to be "appropriate when '[a court] simply vacates 'unlawful convictions (and accompanying sentences) without choosing to reevaluate the entire sentence.'" Peña, 58 F.4th at 619 (quoting Augustin, 16 F. 4th at 232).

In this case, even with the vacatur of Count Three, Abu Mezer still faced unaffected, concurrent life sentences on Counts One and Two. Therefore, it was well within the district court's discretion — and consistent with Peña — to deny Mezer's request for a de novo resentencing. Indeed, in United States v. Ayyad, 20-3832, 2023 WL 1975682 (2d Cir. Feb. 14, 2023) (summary order), this Court applied its ruling in Peña to a set of facts strikingly similar to those at issue here. For his role in the 1993 World Trade Center bombing, Nidal Ayyad was convicted of several felonies and sentenced to 1,405 months (over 117 years), 360 of which were tied to two convictions under § 924(c). Id. at *1. Following the Supreme Court's ruling in Davis, the district court in

24

Ayyad's case granted his § 2255 motion to dismiss both of his § 924(c) convictions and accordingly reduced Ayyad's sentence by 360 months. Id. Nevertheless, the district court declined Ayyad's motion for de novo resentencing on Ayyad's remaining convictions. Id. This Court upheld that decision, concluding that, "in light of our holding in Peña, the district court was not required to conduct de novo resentencing after vacating Ayyad's conviction" under § 924(c). Id. Specifically, this Court found that "given the nature of Ayyad's crimes, the significant amount of time remaining on his sentence, and Ayyad's current age — resentencing would not realistically lead to a sentence short enough for Ayyad to be released within his lifetime," thereby rendering de novo resentencing an entirely academic exercise. Id.

The facts of this appeal closely track those in Ayyad and are consistent with the category of "empty formalities" identified by Peña, 58 F.4th at 623. Here, following the Supreme Court's ruling in Davis, the district court similarly granted Abu Mezer's § 2255 motion to dismiss his § 924(c) conviction and accordingly reduced his sentence by eliminating the consecutive term of 30 years' imprisonment predicated upon it. However, just as Ayyad faced an overall sentence likely to eclipse his

lifetime even after the vacatur of his § 924(c) convictions, Abu Mezer similarly faces life sentences on the remaining counts of conviction under 18 U.S.C. § 2332(a). Granting Abu Mezer de novo resentencing on his concurrent life sentences then would be just as much an academic exercise as resentencing Ayyad on his remaining convictions. In both cases, the seriousness of the terrorism crimes in question and the sentences imposed for them was such that de novo resentencing would be unlikely to result in a meaningful possibility of release. Indeed, the district court concluded as much: "In any event, the seriousness of the offense leads the Court to conclude that it would adhere to the original sentence." (A 54).

Finally, Abu Mezer is also wrong to claim that the district court abused its discretion by purportedly (1) focusing solely on the seriousness of the offense and (2) failing to take "the full array of 18 U.S.C. § 3553(a) factors into account," meaning, by this latter point, that the district court failed, inter alia, to account for changes wrought by United States v. Booker, 543 U.S. 220 (2005) (the Guidelines are no longer mandatory), and its progeny. (Br. 24-27). What Mezer fails to note is that even taking into account changes in the Guidelines over the

years, he still faces life sentences on each of the two remaining counts of conviction. See U.S.S.G. §§ 2A1.5(c)(2), 2A2.1(a)(1), 3A1.1(a), 3A1.4(a), 3A1.4(b), 3C1.1, 3C1.2) (resulting in a Guidelines range of life based on a Criminal History Category of VI). Also, even if the Guidelines are no longer mandatory, Abu Mezer ignores, or at the very least callously minimizes, the extreme seriousness of his crimes, i.e., the threatened detonation of multiple fabricated pipe bombs with the potential and intent to kill or maim dozens or more targeted victims (people of Jewish faith or heritage) — factors which were thoroughly considered by Judge Raggi at the time of Abu Mezer's original sentence and also relied upon by Judge Block in his decision to deny Mezer a de novo resentencing. To the extent Abu Mezer is unhappy with such analysis, this Court has held that "disagreement with the district court's weighing of certain Section 3553(a) factors does not establish an abuse of discretion." United States v. Fertides, No. 20-3809-cr, 2021 WL 5918301, at *2 (2d Cir. Dec. 15, 2021).

Accordingly, because the district court rightly recognized its authority to hold a de novo resentencing but nevertheless found that it was unnecessary in light of Abu Mezer's serious crimes and concomitant

27

life sentences, it did not abuse its discretion in refusing to conduct a de novo sentencing in this case.

B.    Abu Mezer's Arguments to the Contrary Are Mistaken

Even if this Court had the authority to overturn prior Second Circuit precedent, Abu Mezer cannot prevail.  The plain text of 28 U.S.C. § 2255, as recognized by every sister circuit to have considered the issue, supports this Court's decision in Peña.  See Peña 58 F.4th at 619 ("The government argues that every circuit to analyze this issue has held that de novo resentencing is not required in this context.  That appears to be correct.").[6]  See, e.g., Augustin, 16 F.4th at 231-33 (holding that vacating one conviction in multi-count judgment does not require resentencing); Troiano v. United States, 918 F.3d 1082, 1087 (9th Cir. 2019) ("[T]he decision to unbundle a sentencing package — that is, to conduct a full resentencing on all remaining counts of convictions when one or more counts of a multi-count conviction are undone — rests within the sound discretion of the district court."); United States v. Palmer, 854 F.3d 39,

---

[6]    Even the defendant in Peña "conceded that no other circuit has held that de novo resentencing is required in the § 2255 context."  58 F.4th at 620.

28

49 (D.C. Cir. 2017) ("Section 2255(b) accords [district courts] discretion in choosing from among four remedies, 'as may appear appropriate.'").

Indeed, the language of § 2255 grants broad discretion to district courts to determine what remedy "<u>may</u> appear appropriate." 28 U.S.C. § 2255(b) (emphasis added). Under this exercise of discretion, district courts are empowered to choose from a wide menu of potential options: they may, as appears appropriate, "discharge the prisoner <u>or</u> resentence him <u>or</u> grant a new trial <u>or</u> correct the sentence." <u>Id.</u> (emphasis added). Such is the wide extent of judicial discretion envisioned by the statute, that under § 2255(c), courts may even decide to "determine such [a] motion without requiring the production of the prisoner at the hearing."

This Court's textually driven reading of § 2255 is far from novel as "[d]istrict courts in this Circuit have come to a similar conclusion" many times before. <u>Peña</u>, 58 F.4th at 619. Thus, while Abu Mazer claims that "[u]ntil <u>Peña</u>, 58 F.4th at 613, this Court consistently held that a defendant is entitled to <u>de novo</u> resentencing following the vacatur of a count of conviction whether on direct appeal or from habeas petition," his assertion ignores important pre-<u>Peña</u> cases finding the

opposite. (Br. 20-21). <u>See, e.g.</u>, <u>United States v. Medunjanin</u>, No. 10-cr-0019 (BMC), 2020 WL 5912323, at *8 (E.D.N.Y. Oct. 6, 2020) ("the default rule does not require a <u>de novo</u> resentencing in the § 2255 context" because the "plain text of § 2255 vests the court with the discretion to determine first the nature of the relief that may appear appropriate" (internal quotation marks omitted)); <u>Ayyad v. United States</u>, No. 16-cv-4346 (LAK), 2020 WL 5018163, at *2 (S.D.N.Y. Aug. 24, 2020) (ruling that a de novo resentencing default rule "would be in tension with the narrow scope of Section 2255").

Further, while Abu Mezer urges this Court to apply the "logic of the <u>Rigas-Quintieri</u> rule" (Br. 22) and thereby require de novo resentencings in relation to § 2255 proceedings, his characterizations of <u>United States v. Quintieri</u>, 306 F.3d 1217, 1221 (2002), and <u>Rigas</u>, 583 F.3d 108, also miss the mark. The <u>Quintieri</u> Court explicitly defined its task as addressing "questions that emerge when an appeal results in a remand for resentencing," 306 F.3d at 1221, and based its ruling expressly on reasoning about the "spirit of the mandate" on remand, <u>id.</u> at 1228. Similarly, in <u>Rigas</u>, the Court clarified <u>Quintieri</u>, explaining that its rule requiring de novo resentencing applies "where a conviction

30

is reversed in part <u>on appeal</u>," 583 F.3d at 115 (emphasis added).  Neither of the cases Abu Mezer urges the Court to consider in overturning its own precedent involve an interpretation of 28 U.S.C. § 2255.

Abu Mezer further cites to <u>United States v. Hertular</u>, 562 F.3d 433 (2d Cir. 2009), for the proposition that post-<u>Quintieri</u> cases require de novo resentencing "on the vacatur of any count of conviction." (Br. 23).  However, much like the other cases Mezer relies on, <u>Hertular</u> did not concern resentencing following vacatur on a § 2255 motion; instead, <u>Hertular</u> involved a direct appeal in which de novo resentencing was required on remand after a count of conviction was vacated.  <u>See</u> 562 F.3d at 435.

Finally, Abu Mezer cites to <u>Gordils</u>, 117 F.3d 99, in support of his argument that <u>Peña</u> was wrongly decided.  Specifically, Mezer claims that "<u>Gordils</u> contravenes the critical premise of <u>Peña</u>'s ruling — that a § 2255 proceeding so differs from direct review as to counsel against <u>de novo</u> resentencing following conviction error." (Br. 28).  First, Abu Mezer misstates <u>Peña</u>'s holding — <u>Peña</u> does not 'counsel against' de novo resentencing, but instead gives district courts the discretion to conduct de novo resentencing.  Second, <u>Gordils</u> only rejects the notion that district

courts can <u>never</u> have the power under § 2255 to resentence on remaining counts following vacatur of others; it does not hold or even suggest that district courts <u>must</u> do so, which is the argument advanced by Abu Mezer. <u>See</u> 117 F.3d at 102-04. A district court may use its same § 2255 discretion to resentence after the vacatur of a conviction as recognized in <u>Gordils</u> or alternatively decline to do so as recognized in <u>Peña</u>. The decisions exist together in harmony.

As such, the plain text of the statute and legal precedent in this Circuit and in sister circuits supports this Court's decision in <u>Peña</u> and the district court's order, thus, should be affirmed.

32

## CONCLUSION

For the reasons stated above, the district court's order should be affirmed in all respects.

Dated:      Brooklyn, New York
             July 31, 2023

Respectfully submitted,

BREON PEACE,
United States Attorney,
Eastern District of New York.

By:   /s/ DANA REHNQUIST
       DANA REHNQUIST
       Assistant U.S. Attorney

JO ANN M. NAVICKAS,
DANA REHNQUIST,
Assistant United States Attorneys,
    (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 6,129 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        July 31, 2023

                                   /s/ JO ANN M. NAVICKAS
                                   JO ANN M. NAVICKAS
                                   Assistant U.S. Attorney

APPENDIX

# TABLE OF CONTENTS

Page

Excerpt of Sentencing Transcript,
  United States v. Abu Mezer, 97-CR-804 (RR),
    Dated March 1, 1999 ..................................................................GA 1

1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,
4                                    CR. 97-804

5         -against-              United States Courthouse
                                 Brooklyn, New York
6   GAZI IBRAHIM ABU MEZER,

7         Defendant.
                                 March 1, 1999
8    - - - - - - - - - - - - - X    9:30 o'clock a.m.

9            TRANSCRIPT OF EXCERPT OF SENTENCE
10      BEFORE THE HONORABLE RINA RAGGI
             UNITED STATES DISTRICT JUDGE
11
APPEARANCES:
12
For the Government:    ZACHARY W. CARTER
13                     United States Attorney
                       BY:  BERNADETTE MIRAGLIOTTA
14                          JOHN CURRAN
                       Assistant United States Attorneys
15                     225 Cadman Plaza East
                       Brooklyn, New York 11201
16
For the Defendant:     LAWRENCE RUGGIERO, ESQ.
17

18

19

20  Court Reporter:        Burton H. Sulzer
                           225 Cadman Plaza East
21                         Brooklyn, New York
                           (718) 254-7211
22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by CAT.

25

            BHS    OCR    CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 2 of 32 PageID #: 352

2

```
 1          (Open court.)

 2          THE COURT:   U.S. v. Gazi Abu Mezer.

 3          (Defendant present.)

 4          THE COURT:   Counsel, note your appearances formally

 5  for the record.

 6          MR. RUGGIERO:   Lawrence Ruggiero for the defendant,

 7  your Honor.

 8          THE COURT:   Good morning, Mr. Ruggiero.

 9          MR. MIRAGLIOTTA:   Bernadette Miragliotta and John

10  Curran for the United States.

11          THE COURT:   Good morning.  Good morning, Mr. Abu

12  Mezer.

13          This matter is before the court for sentencing.  I

14  have had an opportunity to review the presentence reports,

15  which at this point include a third addendum, which I believe

16  was dated January 21, 1999.

17          I've also received correspondence from both the

18  defense and the government.  The most recent correspondence is

19  the government's letter of February 24, and then two

20  submissions by the defense, dated February 26.

21          I gather that somehow the government didn't get the

22  February 26 correspondence, and so I've tried to make copies

23  for you.

24          Do you need a few minutes, Miss Miragliotta?

25          MR. MIRAGLIOTTA:   No.  I was able to review them.
```

BHS    OCR    CM

3

1          THE COURT:   Is there anything more current that I
2     should have than those submissions, ladies and gentlemen?
3          MR. RUGGIERO:   No, your Honor.
4          MR. MIRAGLIOTTA:   No, your Honor.
5          THE COURT:   I know there are a number of issues to
6     address.  Before we turn to those, let me make sure that all
7     the rules are complied with.
8          Mr. Ruggiero, can I get you to note on the record
9     that you have seen the presentence reports.
10          MR. RUGGIERO:   I have.
11          THE COURT:   Have you discussed them fully with your
12     client?
13          MR. RUGGIERO:   Yes.
14          THE COURT:   Mr. Abu Mezer, have you seen the reports
15     that have been prepared about you by the court's Probation
16     Department?
17          THE DEFENDANT:   Yes.
18          THE COURT:   Have you had enough time to discuss them
19     with your lawyer?
20          THE DEFENDANT:   Yes.
21          THE COURT:   All right.  Are you still satisfied with
22     the assistance Mr. Ruggiero has given you in this case?
23          THE DEFENDANT:   Yes.
24          THE COURT:   I do want to commend you for this,
25     Mr. Ruggiero, because I thought when I replaced Mr. Padden and

BHS    OCR    CM

4

1   Miss Rostal, who I thought did an excellent job for the

2   defendant, it would be a difficult task for a lawyer to

3   familiarize himself with everything that's gone on in this

4   case, but the very careful and detailed submissions you've

5   given to the court make it plain that you have done just

6   that.

7           Turning to the presentence report.  I noted a number

8   of objections in the letters that the defense submitted.  The

9   first that I noted is the challenge to the Probation

10  Department's recommendation that there be a 3A1.4 enhancement

11  for terrorism.

12          The second objection I noted was to the application

13  of the statutory consecutive sentence for count three to any

14  that is imposed on counts one and two.

15          The third objection was to the enhancement for

16  reckless endangerment during flight.

17          The fourth challenge goes not so much to the

18  guidelines as to the propriety of imposing a life sentence

19  given the total facts and circumstances of this case.

20          Mr. Ruggiero, are those all the factual or legal

21  objections or have I overlooked anything?

22          MR. RUGGIERO:   My client would like to also raise

23  objection to his being classified as an organizer in

24  connection with these crimes.

25          THE COURT:   I was going to raise that myself.  That

BHS   OCR   CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 5 of 32 PageID #: 355

5

1  certainly is something I'd be prepared to address.

2          Is there anything else?

3          MR. RUGGIERO:   Nothing beyond that, your Honor.

4          THE COURT:   All right.  Why don't we start with the

5  last point first.  I did have a question in my own mind about

6  Mr. Abu Mezer being treated as an organizer.

7          Does the government want to be heard on that, Miss

8  Miragliotta?

9          MR. MIRAGLIOTTA:   Your Honor, we actually are not

10 seeking that enhancement.  We indicated that in our first

11 letter and probably more clearly in our more recent

12 correspondence.

13         THE COURT:   All right.  I, of course, tried this

14 case, have dealt with issues that have arisen in connection

15 with the sentencing of the codefendant.

16         I am going to delete that 2-point enhancement.

17 Mr. Abu Mezer will not have any enhancement to his sentence

18 for role.  I think practically speaking, unless there are any

19 other changes, that won't make a real difference.  So let's

20 turn to the other issues.

21         Mr. Ruggiero, do you want to be heard any further on

22 this issue of the 3A1.4 enhancement for terrorism?

23         MR. RUGGIERO:   No, your Honor.  I believe that our

24 submissions deal with that point in a pretty detailed fashion

25 and I would rest on those submissions.

BHS     OCR     CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 6 of 32 PageID #: 356

6

1        THE COURT:   All right.  Similarly, is there anything

2   more you want to add to the challenge about the reckless

3   endangerment enhancement?

4        MR. RUGGIERO:   Only, your Honor, that we don't think

5   that the government has met its burden with respect to that

6   enhancement.

7        THE COURT:   All right.  Those two challenges go

8   directly to guideline calculations so let's stop there for a

9   moment.

10        Miss Miragliotta, I've seen your submissions as

11   well.  They are detailed, just as Mr. Ruggiero's were.  Is

12   there anything more you'd like to add?

13        MR. MIRAGLIOTTA:   No, your Honor.  We rely on those

14   as well as the evidence introduced at trial.

15        THE COURT:   Let me start with the reckless

16   endangerment.  The standard, of course, at this proceeding is

17   proof by a preponderance of the evidence.

18        I have reviewed the evidence that did come out at the

19   suppression hearing and at trial about the police entry into

20   Mr. Abu Mezer's bedroom and the arrest with an exchange of

21   gunfire by the police of both Mr. Khalil and Mr. Abu Mezer.

22        I am satisfied by a preponderance of the facts and

23   circumstances that Mr. Abu Mezer did attempt to wrestle the

24   officer's gun from him thereby endangering every person in the

25   room.

BHS     OCR     CM

7

1          Let me say that, of course, since there is no ability

2   to identify him directly, I have to look to the totality of

3   the circumstances.  The most direct proof identifying him was,

4   of course, the evidence with respect to the scar.  But I'm

5   also satisfied that the evidence about when and how Mr. Abu

6   Mezer was shot in the legs supports the finding that he was

7   the aggressor in that incident, not Mr. Khalil.

8          Mr. Abu Mezer has a different version of events, I

9   understand that, but I credit the officer.  I said that after

10  the suppression hearing and certainly there was nothing at

11  trial to alter my view of his credibility.

12         I will finally note, Mr. Abu Mezer, you have been

13  before the court on many occasions.  The kind of reckless

14  conduct that the officer described was entirely consistent

15  with the kind of reckless conduct that you engaged in, in many

16  of the appearances here in court.

17         So I find it entirely consistent with everything I

18  know about you that the officer would have been testifying

19  credibly and that it was you who engaged in this.  I am

20  satisfied by more than a preponderance of the evidence.

21         With respect to the terrorism enhancement, I am

22  persuaded by the government's argument that terrorism has to

23  be looked at as defined by the guideline.  It really requires

24  two things to be proved:  First, is the commission of a crime,

25  such as the defendant has been convicted of; but, second, the

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 8 of 32 PageID #: 358

8

1   action has to have been calculated to influence or affect the

2   conduct of government by intimidation or coercion.

3           In short, one could not have intended to use weapons

4   of mass destruction to make a point about some personal

5   disappointment or some act of vengeance against an employer or

6   family member or friend.  There has to have been this specific

7   purpose to influence or affect the conduct of government by

8   intimidation or coercion.

9           I am satisfied from the physical evidence offered by

10  the government, specifically the letter, and from Mr. Abu

11  Mezer's own testimony at trial, that his purpose from the time

12  he entered the United States until the day of his arrest was

13  to try to find some way of punishing the United States for its

14  foreign policy with respect to Israel and Iraq.  He testified

15  to that unequivocally at trial.

16          So to that extent, I find that there is more than the

17  commission of the crime of conviction; there was terrorism

18  underlying it, so I'm going to use the enhancement.

19          The next objection that we have to turn to is the

20  challenge to the consecutive sentences.

21          Mr. Ruggiero, as the government points out, the

22  double jeopardy aspect of this was addressed somewhat

23  pretrial.  Is there anything more that you want to argue in

24  light of the fact that the court already made rulings that

25  count three was not violative of double jeopardy?

BHS    OCR    CM

9

1     MR. RUGGIERO:   We stand on our submissions in that

2 regard, your Honor.

3     THE COURT:   It appears to me that, using the

4 Block-Berger test, count three did require the government to

5 prove an element different and apart from what it was required

6 to prove under count one and count two.

7     Indeed, until we went on trial, I did not quite

8 appreciate how difficult the government's ability to obtain

9 conviction could be given the differences in the various

10 elements.

11     Mr. Abu Mezer's testimony admitting his desire to

12 hurt and injure people, while nevertheless trying to skirt

13 some of the elements of various of the charges, highlighted

14 that for the court.

15     The crime of conspiracy in this case did not require

16 the defendant to have built or had in his possession a

17 completed and operable bomb.  He did.  And that's what count

18 three addressed, and that's why the enhancement seems

19 appropriate.

20     Now, I gave considerable thought to your argument,

21 Mr. Ruggiero, that there is another crime that the government

22 might have charged that would perhaps not have the same

23 penalties as what it did charge in count three.  But that

24 appears to me to frequently be the case when Congress tries to

25 deal with similar if not identical conduct in various ways.

BHS    OCR    CM

10

1        So this crime is separate from what was charged and

2   proved in count one and count two.  To that extent it appears

3   that double jeopardy is not violated.

4        That leaves us with the last argument on the count

5   three enhancement and on the sentencing overall, that there

6   would be a violation of due process.

7        Do you want to be heard any further on this?

8        MR. RUGGIERO:   I do.

9        THE COURT:    Please.

10       MR. RUGGIERO:   I would like to address the

11  circumstances, the personal circumstances in Mr. Abu Mezer's

12  life which I believe greatly contributed to his being here

13  today.

14       When I first began to represent him, I thought I was

15  going to be representing somebody who is completely crazy.

16  After I spent some time with him, I realized that the answer

17  is not quite that simple; in fact, it's a lot more complex

18  and, frankly, a lot more sad than it appears on the surface.

19       Those personal circumstances, which I explored with

20  him, and which were documented to some extent, were far worse,

21  your Honor, than many of the personal circumstances, frankly,

22  far worse than all of the personal circumstances I've ever

23  heard about which warranted a downward departure from the

24  sentencing in the United States.

25       Just to summarize what they were.  When he was an

BHS    OCR    CM

11

1   impressionable young child, he and his family were repeatedly

2   subjected to calculated humiliation and the worst kind of

3   torture that anyone can imagine, the worst kind of torture

4   that adults could devise, in fact.

5        It started when he was very, very young, a mere

6   child.  He watched his father, who was a successful

7   businessman, have his business taken from him and given to

8   others.  He watched his house -- it was a nice house -- get

9   taken from him and given to others.

10       He and his family, a large family, were thrown out of

11  their house so that others could live in it and their business

12  taken away so that others could get their assets and forced to

13  live someplace else in complete poverty.

14       It didn't end there when he was a kid.  Soldiers

15  would come in at night, knock down the doors at about 12:00

16  o'clock at night and completely intimidate and humiliate the

17  entire family, particularly the father, who Gazi Abu Mezer

18  idolizes.

19       The father is a very peaceful man.  Frankly, I think

20  that is part of the reason Gazi is here.  He saw a very, very

21  good, peaceful, hard-working man be repeatedly humiliated in

22  front of his children.  On a couple of occasions, they went in

23  and stuck a knife at his father's throat wanting information

24  from him about the Palestinians in the community because the

25  father was so highly regarded in the Palestinian community.

BHS    OCR    CM

12

1          And then things got worse, and there were a couple of

2     events which I believe crystallized the recklessness in Gazi

3     Abu Mezer.

4          Your Honor, this is a person who has committed some

5     serious crimes; this is a person who is an idealogue, who has

6     made speeches about Jews and Israelis.  He's also a person who

7     was incredibly respectful of the Jewish psychologist who

8     examined him, with whom he got along very, very well.

9          He's someone who has had many more jobs and worked

10    harder than many of the defendants I've ever represented, at

11    legitimate jobs.  But something happened that crystallized

12    this recklessness in him, and I think, your Honor, it's when

13    he was sent to this Israeli detention center, the military

14    camp for the first time.  There, as a young boy, he was

15    tortured, subjected to the traditional tortures that occur in

16    those camps.

17         Very well documented are these tortures in these

18    psychology journals being written nowadays, and the books

19    being written about the effects of that political violence on

20    Palestinian children.  You have here in front of you a classic

21    example of what those books and what those journals describe;

22    a fifteen, sixteen-year-old kid taken into a camp, box put on

23    his head, beaten and caned, which is a very commonly used form

24    of torture over there.

25         He had to stand in a square about 10 foot by 10 foot

BHS     OCR     CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 13 of 32 PageID #: 363

13

1   and urinate and defecate on himself while he stands there

2   motionless if he can for three, four days during the initial

3   phase of this interrogation process and, of course, if he

4   moves out of that square he's severely beaten.

5        That was the beginning of it.  Then, of course, comes

6   hanging him on a wall with the other inmates and then,

7   finally, when he was released after the first time, about six

8   months later, he's chained to the front of a Jeep and driven

9   around the Palestinian community as an example, to show the

10  other children that this is what happens to you when you are

11  taken to an administrative detention center in Israel.

12       They also put him on the Jeep so that kids wouldn't

13  throw rocks at the Jeeps that they usually do at the behest of

14  the schools and the Palestinian political groups that have

15  virtually control over the schools.  By the way, those schools

16  wind up eventually getting closed by the Israelis, as happened

17  in his case.

18       Your Honor, that was the first time.  The second time

19  doesn't appear to be much better, and I respectfully submit

20  that very few people could withstand that kind of calculated

21  brutality and torture and not have that make them a little

22  crazy and a little reckless.

23       This is not an excuse for what Gazi Abu Mezer did.

24  I'm just telling you, you have here in front of you, your

25  Honor, somebody who has been through a lot more than many of

BHS    OCR    CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 14 of 32 PageID #: 364

14

1   the defendants, if not all of the defendants in this

2   courthouse today.

3           I don't think he's beyond all hope by any stretch of

4   the imagination.  Some might ask, well what has the United

5   States to do with all of this?  Why was his recklessness

6   directed towards the United States?

7           I don't know the answer to that, but I respectfully

8   submit that when you provide the bullets that shoot these

9   kids, the rubber bullets have made in USA on them, and when

10  you provide the gas that gases these kids and the cannisters

11  have made in USA on them, here's what you get, this is it.

12          I have nothing to add, your Honor.

13          THE COURT:   Thank you, Mr. Ruggiero.

14          Mr. Abu Mezer, you don't have to say anything, but if

15  you'd like to be heard before I impose sentence, I'd be

16  pleased to listen to you.

17          THE DEFENDANT:   I would like to make a statement.

18          THE COURT:   You may.

19          THE DEFENDANT:   In the name of Allah, good morning,

20  Miss Judge, good morning, ladies and gentlemen.

21          As everybody knows, my name is Gazi Ibrahim Abu

22  Mezer.  I grew up in West Bank, City of Hebron, living under

23  the most unjust country in the history of world.

24          I lived under the Israeli Army occupation for twenty

25  years, facing all kind of suffering of the aggression of the

15

1   Israeli Army, which all the human beings in Palestine is not

2   worth for the Israeli Army bullets to shoot and kill anybody.

3         The Palestinians are fighting because their land

4   being stolen by the Jews.  They don't fight for nothing.  The

5   Palestinian find himself as a victim of this aggression of the

6   Israeli ever since 1948.

7         The Israeli occupation for the land of Palestine left

8   suffering and destruction to every family live there and it's

9   known since the Bible time as area of unstable, always war.

10  We look at the history, we see how much they care to control

11  the Holy Land.  They don't care how.

12        The Jews we are talking about today, they are the

13  same Jews who tried to crucify different prophets, like

14  Prophet Jesus, 2000 year ago, and they tried, and they killed

15  Prophet Zachariah and his son, and they try to kill the

16  Prophet Mohammed and who they are killing the Palestinians,

17  Muslims and Christians in the Holy Land.

18        The history of the Jews is well-known by all

19  religions, what they did to put down God on the earth.  They

20  deport over 15 million Palestinians.  They become refugees

21  1948 and 1967 wars, and confiscated their houses, land,

22  businesses, everything belong to them, these refugees.  They

23  become even refugees in their own homeland, too.

24        My family, myself, my sisters, my brothers, my

25  neighbors, we all become refugees, collect each other in the

BHS      OCR      CM

16

1   camps.  My family lost house and the land for the Jews who

2   come in secret immigration from Europe.

3           I seen members of my family getting arrested,

4   beaten.  The Israeli Army put the knife on my father throat

5   when I'm ten-years-old in the middle of the night when they

6   come to arrested my father.

7           We suffer more during the Intifada.  I seen my

8   friends got killed by the Israeli Army.  They close the

9   schools for six years for accusations that we use the school

10  for political not to study.  They arrested me when I am

11  16-years-old and I been interrogated for forty-five days for

12  first time; harassed, beaten, putting on the walls for days,

13  no sleep, no food.  They use all kind of physical violence and

14  mentally want me to tell on my friends who throw rocks in my

15  neighborhood.

16          I got arrested again two month after that arrest.

17  They put me in the desert for three month, they spray gas on

18  us, and after I got released I get a green identity card that

19  I can't leave the city for security reason.

20          The weapons they use, it's United States making

21  weapons from gas, from bullets, from bombs, plastic bullets,

22  everything, rubber bullet, all made in the United States and

23  we could look when somebody get shot, we see the bullet said

24  made in United States.

25          United States Government does not only give weapons,

BHS    OCR    CM

17

1   they also give four billion dollar every year from taxpayer

2   money to Israel; to every Jews live there thirty, forty

3   thousand dollars goes to him to his pocket.  United States

4   care about the Jews who live in Israel more than what they

5   care about their own citizens.

6        The Jews be crying about what Hitler did to them, we

7   all see that in the medium, in the Holocaust.  There is

8   nothing for the Holocaust.  They use this as excuse to cover

9   their massacres in the Palestinians -- of the Palestinians.

10        They said that Hitler letter killed six million

11  Jews.  That's a lie.  Three years after that, they went with a

12  big army, with the help of the British, and killing and

13  massacring the people of Palestine.  They destroy over 250

14  village and 150 city and change the names to the Hebrew names

15  after they kill the people or deport them from that land.

16        Real Holocaust is what is happening in the street of

17  Gaza and West Bank right now..  If there is a justice in this

18  world, the Israeli leaders should be tried as war criminal and

19  charged with genocide for killing over half million

20  Palestinians since 1948.

21        They have control the Palestinian life; they control

22  water, electricity, the minimum thing in our live they

23  control.  They control everything.  In everyday of the

24  Palestinian calendar there is a massacre committed by the

25  Jewish settler or army, and they violate all United Nations

BHS    OCR    CM

18

1   resolutions.

2          They never took action against them because the

3   United Nations is conspire with the Israeli government.

4   Israeli government, Israel is created on the blood of the

5   Palestinian and their torture of the Palestinians, and all

6   countries vote for Israel.  It's a holy war, but Israel is

7   waging war against the Muslims.

8          And what happened on Fourth Avenue, now I am going to

9   show the courtroom how my rights being violated by the

10  government of the United States.  I am going to show the

11  government misconduct, government outrage, misrepresentation

12  by lawyers, miscarriage of law and violation of agents.

13         My lawyer while representing me in the trial deny me,

14  deny me when I ask him about psychologist to examine me

15  mentally, he ignore what I say to him several times, which

16  will have affected on the jury's deliberations.

17         The lawyer deny me from having all government

18  material, including statements being taken from people,

19  pictures found in the apartment on Fourth Avenue and North

20  Carolina.  The government called -- called forward to give me

21  all evidence because most of the material being shown in the

22  trial is for Heshim Selim, who was roommate for me and he was

23  a construction worker.

24         I was having a question for the government witnesses

25  who come to take the stand and my lawyer always tell me that

BHS     OCR     CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 19 of 32 PageID #: 369

19

1    we can't answer -- can't ask these questions because we have

2    to go between the lawyers, the government questions.

3            During my trial I watch my lawyer several time bring

4    book and card and her small computer during my trial and she

5    ask me several times to belong -- this is lawyer Jan.

6            THE COURT:   Jan --

7            THE DEFENDANT:   She was playing computer, she was

8    playing on her computer.

9            Jan Rostal, first, when I got arrested she identified

10   herself as an Irish, then American, then I find out after

11   while that she's a Jewish.

12           I have a strong feeling that Mr. Padden is working

13   with the government to try and get information from me to help

14   the government get conviction in my case.  He told the

15   government on the camera, I believe, and about some bullets I

16   been bought from Walmart in North Carolina, but the government

17   don't say that directly, but they bring it in a different way.

18           There miscarriage of law and my right during my

19   arrest and shooting me without make no move and the shot on my

20   body was at zero distance and I didn't make no move when they

21   did that.

22           They lie about the design of the bomb which is

23   brought to the jury and they have compare it to the bomb which

24   is found in the Fourth Avenue, to fix their own statements

25   they been made that I hit one of the switches in the bomb, but

                        BHS    OCR    CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 20 of 32 PageID #: 370

20

1   they designed this bomb because if I hit one of the switches

2   the bomb goes off, but they make a design for the bomb that if

3   you hit one of the switches this will not big go off, you

4   still have four switches to hit.

5           Government misconduct, they have no search warrant

6   obtained from court, which is violated the rights of the

7   people who live in the United States and listen to the

8   information obtained by informant.

9           The government couldn't prove during my trial that I

10  am in conspiracy with anyone.  The government while

11  interrogating me in the hospital, they taken statements from

12  me and my lawyer was standing outside the door and they say

13  that I am in such a room where I can't talk to nobody and at

14  the same time they was taking, they was taking statements from

15  me and being used, and Miss Jan Rostal took the stand and

16  explained that to the jury -- in the hearing.

17          Mossabbah, the informant, fingerprint was found on

18  the papers which has been sent to the U.S. department in

19  Washington.  He's the one who wrote that letter.  The

20  government in the third count falsely charged me with using

21  the bomb.  There is no bomb being used.

22          I didn't see my family since I am nineteen-years-old,

23  since I left the occupied territories and the government

24  denied them visas to come to see me.

25          My old lawyer, Mr. Padden, Miss Rostal, never explain

BHS   OCR   CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 21 of 32 PageID #: 371

21

1  to me the PSI, and they advise me not even to meet with or

2  talk to them, to the probation officer.  They never explained

3  the guideline, they never explained the counts for me, how

4  much I'm facing for each count.

5          The media representation was encouraging me that when

6  I took the stand to try to show my people that I did something

7  and to call me like a hero back home.

8          I am asking you, Miss Raggi, to order the government

9  and the lawyer, okay, to give me all the material they have of

10 evidence because I'm thinking for making an appeal and I would

11 like to go with these materials because I don't have all the

12 materials in my possession.

13         By finishing my statement, I would like to thank the

14 court for making me -- for giving me the opportunity to

15 express myself and the way I feel, and I would like to tell

16 the people to send a letter to the Congress asking them to

17 stop supporting for the Jewish estate because that is wrong

18 and they should use this money for something better than to

19 give and kill us, the gifts what they do to the Palestinian

20 people, and that would be the biggest problem.

21         I would like to ask everybody to think about the day,

22 we all one day we gonna die and no one of us will take

23 something with us.  The judgment will come from Allah,

24 judgment between everybody of us.  We all should worship right

25 and worship one God, and God is watching every man and he know

BHS      OCR      CM

22

1  what is in every man heart.

2      I will remind you of the day when you raise from the

3  dead, all of us, and every humankind will be held, judged by

4  his own deeds.

5      Thank you, Miss Raggi.

6      THE COURT:   Thank you.

7      Miss Miragliotta, does the government wish to be

8  heard?

9      MR. MIRAGLIOTTA:   Briefly, your Honor.  I just want

10  to say that, with all due respect to Mr. Ruggiero, the

11  statements regarding Mr. Abu Mezer's treatment in Israeli

12  detention, while not minimizing, and I don't have a full

13  comprehension of what the situation there is like, these

14  claims of torture are based on Mr. Abu Mezer's statements.

15      More importantly, your Honor, the defendant chose to

16  come to the United States, and he chose to take seemingly an

17  opposite course from his brother, who he claims was subject to

18  the same upbringing, who claims to be working for peace in a

19  more diplomatic fashion.

20      He chose to come here to the United States and

21  throughout his time here, I would submit to your Honor that he

22  was treated better than most immigrants who do come.  He came

23  to the United States, was offered shelter, was offered a job,

24  admittedly, as he said at trial, by people of his own

25  background, but he was offered those opportunities.  He didn't

BHS   OCR   CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 23 of 32 PageID #: 373

23

1    work hard.  He shunned those opportunities in favor of

2    violence.

3            As to treatment throughout these proceedings, both at

4    the suppression hearing and throughout trial, by his lawyers,

5    by the court, by everybody, he was afforded all opportunities,

6    all rights.

7            With respect to this psychological exam he hints

8    should have been done prior to trial, the report that the

9    court has and which has been given to the government indicates

10   that Mr. Abu Mezer knows full well the difference between

11   right and wrong and he chose the wrong path.

12           Moreover, his statements today indicate that he would

13   continue to follow that path of violence; his hatred, his

14   statements about the Holocaust not occurring, these all

15   indicate that he would continue to pursue a path of violence

16   here or wherever he were to live, and it is for those reasons

17   a stiff sentence is warranted.

18           Finally, your Honor, a stiff sentence is warranted

19   because, if it had not been for Mr. Mossabbah's actions, the

20   effect of the pipe bomb that Mr. Abu Mezer built would have

21   been devastating to the people on that subway and, in fact,

22   could have been even devastating to the people, the police

23   officers who were in that apartment because, as your Honor

24   heard during trial, such a device is extremely unstable, and

25   he created a risk to the people around him merely by building

24

1   it, by carrying it from North Carolina.

2         If your Honor has any additional questions, the

3   government would be happy to respond, otherwise we request

4   that you sentence the defendant to the maximum allowed by the

5   guidelines and the statute.

6         THE COURT:   Before turning to some of the points

7   that have been raised, I do have to calculate the guidelines

8   so that it is clear what parameters the court is working

9   within.

10         It appears here that deleting the 2-point enhancement

11   for role, the total offense level in this case would be 47,

12   the criminal history category would be 6.  This would mean

13   that on counts one and two, the guideline range for the

14   defendant would be life imprisonment.  On count three there

15   would be a statutory additional sentence of 30 years.

16         The supervised release term under the guidelines

17   would be three to five years, the fine range, I believe, is

18   20,00 to 200,000 dollars, and a special assessment of one

19   hundred dollars on each of the three counts of conviction, for

20   a total of three hundred dollars.

21         Now, apart from the objections that have already been

22   raised and addressed by the court, is there anything else that

23   anybody wants to be heard on with respect to that guideline

24   calculation?

25         MR. RUGGIERO:   No, your Honor.

BHS     OCR     CM

```
                                                              25

 1          THE COURT:   All right.

 2          MR. MIRAGLIOTTA:   No, your Honor.

 3          THE COURT:   Let me say preliminarily that I reject

 4    the notion that the sentencing ranges, singly or as combined,

 5    violate due process.

 6          The crimes of conviction are extraordinarily

 7    serious.  They involve a plan to use a weapon of mass

 8    destruction, which went so far as to result in the actual

 9    construction of a number of bombs designed and executed so as

10    to wreak maximum human damage.  That was apparent from the

11    nails that were affixed to many of the bombs.

12          Moreover, from all of the evidence that was adduced

13    at trial, it appears that the police intervened literally

14    hours before these bombs were to be placed on a New York City

15    subway.

16          I recognize that Mr. Abu Mezer takes the position

17    that he did not intend to place them on a subway train, but he

18    did testify that he intended to place them somewhere where he

19    could kill as many Jews as possible.  So wherever he intended

20    to place them, the people of this city were literally hours

21    away from having a terrorist attack carried out.

22          It was only through the efforts of the New York City

23    Police Department that that was prevented and that the only

24    two people injured in this entire scheme were the defendant

25    and his friend, Mr. Khalil.
```

26

1      Such conduct is so violative of the public peace and

2  safety as to warrant significant punishment in its own right

3  and serious deterrence for anyone else who might be inclined

4  to engage in that.  A life sentence seems to be appropriate.

5      Indeed, many other crimes not involving the taking of

6  actual life, some drug trafficking crimes, for instance,

7  warrant life imprisonment and have been found not to violate

8  due process.  I cannot imagine that this crime would violate

9  due process by having life imprisonment imposed.

10      Now, the thirty years additional is because Congress

11  has decided that the possession of weapons during crimes of

12  violence present such a tremendous risk and harm that there

13  must be even more deterrence for that.

14      As I said, Mr. Abu Mezer could have planned and

15  plotted and conspired to engage in an act of terrorism and

16  been guilty of it, but it was the actual possession of the

17  firearm, its use and its carrying at various points in the

18  conspiracy, that took us up to the point where, as I said, we

19  were literally at the eleventh hour before these bombs are

20  going to be used.

21      It appears to me to be the exact type of circumstance

22  for which Congress intended there to be enhancements, so I

23  would reject the due process argument.

24      I do not intend to depart, I intend to sentence

25  within the guideline range.  Let me explain some of my reasons

27

1   and address some of the points that have been made here.

2           First of all, no court, certainly not this court,

3   thinks about imposing a life sentence on an individual without

4   serious thought and concern.

5           I completely agree with you, Mr. Ruggiero, when you

6   say that the circumstances that bring Mr. Abu Mezer to the

7   point where he stands before this court facing a life sentence

8   are very complex and on certain levels very sad.  It is always

9   sad to see a human being, a young man so consumed with hatred,

10  and obviously many factors go into creating that kind of

11  hatred in a person.

12          But this court's task today is to deal with the

13  crimes of conviction, it is not to address public debate about

14  either the domestic policy of Israel or the foreign policy of

15  the United States.

16          These crimes of conviction would have presented

17  terrible consequences for average citizens in this district

18  far removed from these international questions.  These people,

19  too, who would have been the victims of Mr. Abu Mezer's

20  terrorism, had families, children, jobs, homes.

21          Whatever has occurred in Mr. Abu Mezer's life, there

22  is no excuse for the decision he made to have these sorts of

23  people bear the consequences of his hatred and frustration.

24          Now, because, as I said, the law wishes to deter this

25  conduct in the strongest possible way, it seems to me that a

BHS     OCR     CM

28

1   sentence within the guideline range is appropriate.

2          There is only one other point that was raised in the

3   comments here that I feel obliged to note, and that concerns

4   Mr. Abu Mezer's criticism about his representation.

5          I have said this before, but I think it bears noting,

6   that this court was consistently and highly impressed by the

7   quality of lawyering provided to you, Mr. Abu Mezer, by Miss

8   Rostal and Mr. Padden.

9          Confronted with overwhelming evidence of your

10  involvement in the charged crimes, they nevertheless spun a

11  theory around the evidence that was aimed at trying to secure

12  an acquittal for you.  Indeed, so zealously did they pursue

13  it, that there were times when I spoke with either Miss Rostal

14  or Mr. Padden here in court about whether they were pushing

15  the envelope too hard and perhaps unfairly.  Nevertheless,

16  they were never deterred from being your forceful and

17  consistent advocates.

18         Miss Rostal gave an opening statement that was among

19  the most powerful that I think has probably been heard in this

20  courthouse; indeed, it got press attention.  Throughout, her

21  examinations, and those of Mr. Padden, showed hours of work.

22  They knew every piece of evidence, they had gone to

23  considerable lengths to develop evidence, whether for the

24  hearing or the trial, to put things in light favorable to

25  you.

BHS    OCR    CM

29

1    They cautioned you about the risks of taking the

2  stand; indeed, we took an adjournment, there was ex parte

3  discussion on this issue.  You chose to take the stand, and

4  that more than anything else contributed to your convictions.

5    Now, you made a comment in the course of your

6  presentation that during the proceedings, Miss Rostal, who had

7  a computer here in court, played games on the computer.  I

8  have no idea if this is the case, but I will say this, even

9  assuming that fact, it would not detract from her

10  extraordinary representation of you.

11    Indeed, I can only assume that anything along those

12  lines was consistent with other things Miss Rostal and Mr.

13  Padden did to try to keep you calm during the trial

14  proceedings.  That, too, was a task that they had to assume

15  over and beyond what a normal trial calls for, to try to keep

16  you from exploding, as you have on all too many occasions.

17    Finally, I will say that even after your decision to

18  take the stand so jeopardized the defense theory that they had

19  vigorously pursued for you, defense counsel gave summations

20  that were, again, remarkable for their vigor, their

21  imagination and their determination to do the best they could

22  for you.

23    I can only say that, reluctant as I was to relieve

24  Mr. Padden and Miss Rostal, the court has been gratified again

25  to see Mr. Ruggiero so vigorously try to represent you in ways

BHS    OCR    CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 30 of 32 PageID #: 380

30

1   that would inure to your benefit.  Here again, though, you

2   have your own agenda.

3          Mr. Ruggiero tried to explain to me the circumstances

4   that got you to the point where you are today.  He has tried

5   to submit to me letters from you and your family that have

6   suggested some degree of remorse and some extenuating

7   circumstances, but you, by your own words, make plain to the

8   court what the truth is, and that is whatever has caused it,

9   you are consumed by hate, you have your own narrow view of

10  your situation, the world's policy decisions, and history, and

11  apparently no one is going to dissuade you from it.  I think

12  you present as much of a risk now as you did on the night you

13  were arrested.

14         I sentence you to the custody of the Attorney General

15  on counts one and two to life imprisonment.  On count three, I

16  sentence you to thirty years imprisonment.  By law that term

17  must run consecutive to the life sentence.

18         I thereafter impose supervised release terms of five

19  years on count one, five years on count two.  They run

20  concurrently.  I won't impose a fine.  It does not appear that

21  you can afford to pay one.

22         I assess you one hundred dollars on each of the three

23  counts of conviction for a total of three hundred dollars.

24  I'm required to do that by law.  You do have the right to

25  appeal.  You must file notice of appeal within ten days.

BHS    OCR    CM

Case 1:97-cr-00804-FB   Document 170   Filed 03/26/99   Page 31 of 32 PageID #: 381

```
                                                               31

 1          Mr. Ruggiero, there was some suggestion that the

 2   defendant does not have all the materials that he wishes to

 3   appeal.  Have you received all of the materials that were in

 4   Mr. Padden and Miss Rostal's possession?

 5          MR. RUGGIERO:   Yes.

 6          THE COURT:   All right.  To that extent, your lawyer

 7   has these materials.  You can work with him, Mr. Abu Mezer.

 8          (Pause.)

 9          MR. RUGGIERO:   He's asking for an album that was

10   among --

11          THE COURT:   Photo album?

12          MR. RUGGIERO:   Yes, which I think is -- I think

13   there is one among the eight boxes or nine boxes.

14          THE COURT:   I think there are two photos albums,

15   aren't there?

16          MR. MIRAGLIOTTA:   There are photographs

17   individually, and there was a photo album seized in North

18   Carolina, which I think is what the defendant --

19          THE COURT:   Those are not going to be returned to

20   you at this time, Mr. Abu Mezer because they are exhibits at

21   trial and the government will maintain custody of them.  If

22   you were to win your appeal, they might have to use that

23   evidence again, but certainly photocopies can be made, to the

24   extent that that might be of any assistance.

25          Was that done as part of Rule 16?
```

GA32

```
                                                                    32

 1          MR. MIRAGLIOTTA:   I believe, your Honor, that we

 2   have made color photographs of all of the photos that were at

 3   issue in the case.

 4          MR. RUGGIERO:   I believe they are in the boxes.

 5   They are sort of scattered and I will collect them and show

 6   them to the defendant, and if there are any other items like

 7   that perhaps I'll take it up with the prosecutor.

 8          THE COURT:   Thank you very much.

 9          MR. RUGGIERO:   Thank you, your Honor.

10          ********

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BHS    OCR    CM